Thank you very much. Good afternoon Judge Santilli, Judge Benton, and Judge Gilman. I'm James Cooney. I represent the appellants Thomas and Betty Wettach. My associate, my son Ryan Cooney, is with me here today. He helped me prepare for the argument, so I brought him along.  As your honors are aware, this is a constructive fraudulent transfer case. It's based upon the debtor's deposit of his wages into an entirety's account, thus rendering them inaccessible to his creditors. We disagree with the amount and some of the items that were awarded to the plaintiff against my clients, but I'm not going to argue those issues today. I'm not going to argue that Thomas Wettach didn't have enough cars or he had too many cars or the amount that the Wettachs spent on improving their home. Rather, I think this is more of a legal issue involving the burden of proof and how the courts below administered that burden of proof. Well, Counselor, you've seen what they said about a burden of production. Do you think they also erred on talking about a burden of production on your client? I think they confused it, too, your honor. That's my point, and I will get into that. The initial step in a fraudulent transfer case like this is that the trustee must prove the amount that was deposited into the entirety's account by the debtor. And I would cite to the court in Ray Titus and in A. Arbogast, both of which are cited in my brief. We believe that the trustee did not submit sufficient evidence of the amount deposited and therefore did not meet his burden of proof. Judge Agreste admitted as much in his opinion at page 63 of the appendix. Judge Agreste said the trustee failed to introduce the exhibits and otherwise failed to directly establish the amount of the deposits. What about the indirect proof by the admission of your client that he told them to put the paycheck there? Certainly my client told them to put the paycheck in, but they don't know how many paychecks were put in because they had no record of that. Well, doesn't your Schedule I say something? You say your Schedule I, you know what I'm referring to, your income Schedule I. Yes. Doesn't that mean you put the two together? The income, he said it went there? Yes, but you have to understand his income varied from year to year. Some years he made over $300,000. Some years he barely made $100,000, all during the four-year look-back period. So I don't think you can just do it that way. The trustee, in fact, relied upon the tax returns of the WETC, which would in fact account for the fluctuation in income, but the amount shown on the tax returns is the gross amount. It doesn't account for deductions, for taxes, for insurance. Well, again, they took your Schedule I and said, you're paying this much in taxes, we subtract that out. That just never happened. Judge Agressi took the gross amount from Line 7 of the tax returns and then somehow made what he called a pro-rater reduction, which he never explained. No, it was based on your Schedule I, right? I do not believe so. There's no mention of Schedule I in his opinion. How did he get to $405,000? I thought he got that off Schedule I. He actually ended up with over $900,000. No, excuse me, then he subtracts $405,000 out for taxes. Right, he does do that, but he doesn't account for any other deductions that might be made for insurance, for additional payments into a pension plan or a retirement plan, things of that nature. Judge Agressi himself admitted that his calculations were arbitrary. He admitted that he was required to connect the dots. Judge Fisher agreed with him. She said Judge Agressi's approach was arbitrary. She said the Bankruptcy Court's findings lacked the type of precision that this court might prefer. So even though both courts found that the calculations were arbitrary, they said, well, it doesn't really matter because the amount that we found is more than the non-necessary expenses. We believe that's contrary to the case law. That's not really what the cases are all about. It might have been equitable, but this is not an equity case. The trustee was still required to establish his burden of proof, and he did not. But the amount of non-necessary expenses was what, roughly $380,000? Well, that's what the court determined. We obviously disagree with that figure. Okay, but assuming that that's his final finding, and if his gross was $900,000, then you're saying he didn't have deductions of two-thirds of his gross? I mean, his net that went into the account must have exceeded $300,000. Right. Assuming that the $900,000 plus $1,000,000 is correct, which we do not, because it was arbitrary. Well, that's not arbitrary. The $900,000 gross is straight from your client's tax return. Well, the $900,000 gross is straight from the tax return, but what he ended up with as a net, we don't even know what he ended up with. Or didn't he testify that roughly $8,500 of deductions was taken out each month out of about $25,000? That depended on that. That was for that year, but it depended year to year. As I said, his salary fluctuated based upon his performance, the number of clients he took in, things of that nature. Whether or not he won a big case and got a big contingent fee, his salary varied, so I don't think you can base it solely on that. Moving on to the second issue, the trustee must prove that the deposits were spent on non-necessary expenditures. And, again, I cited both the Overdick case and the Ingright Ray Titus case. In Titus, the court held that the trustee, in order to prove that no money was deposited into the entirety's checking account during the look-back period, other than such indirect wage transfers, funded such expenditures. Both Judge Agresti and Judge Fisher held that the trustee had the burden to show how much of the deposits were spent on non-necessities. That's in accordance with Pennsylvania law, which they both relied upon because they were dealing with the Pennsylvania Uniform Fraudulent Transfer Act. Twelve Pennsylvania Consolidated Statutes 5102, particularly Comment 6, says that in the context of construction fraudulent conveyances, there can be no shifting of the burden. And I'm going to quote now from the Arbogast case. Now, you're talking about the burden of proof or burden of protection is what I asked about earlier. It's just the burden. Do you think there's a difference in the two in this case? I don't think that there was, no. And here's why. As Judge Arbogast said, even though the question of whether deposits into a checking account may be protected from creditors because they were spent on necessities, there's many of the characteristics of affirmative defense. Under Pennsylvania law, the burden of proof remains with the trustee throughout. Comment 6 to Section 152 specifically rejected the burden-shifting approach in constructive fraud claims, which is now being advocated by the trustee. The drafters of PUFTA describe such burden-shifting as an archaism, which in no event should be followed in applying this chapter. There's no distinction in Comment 6 between burden of production or burden of persuasion, so I don't think that it makes a difference. But in each instance, we would be talking about the weight, that is to say, although you may not have any burden of proof or even production, there's still nothing to weigh against the evidence upon which the trustee was relying, isn't there? I would agree with you, Your Honor, Judge Sembille, definitely. But in this case, there was something to weigh against. What is it that you would say weighed against it? Well, first of all, the courts paid only lip service to the principles set forth in the statute. Both courts actively shifted the burden of production and persuasion. Just wait for a moment to tell me about that. You told us about that. I wanted to know what the evidence was that you said was there to weigh against the evidence upon which the trustee was relying. The evidence that was there was Exhibit 23, and there's certainly a dispute over whether Exhibit 23 is part of the record. We believe that it was. It's covered in our response to the motion to strike. It's covered in our brief. It's cited in both opinions. In fact, Judge Agreste held that he believed it was left out as an intentional strategy. Exhibit 23 shows that, in fact, there were almost $400,000 in additional deposits into that entirety's account that did not come from wages. And it's just as likely as not that the non-necessities were spent with those funds. Now, what exactly is Exhibit 23? Exhibit 23 was a compilation prepared by the trustee based on my client's cue book records that showed all the deposits into the entirety's account. The trustee never offered that into evidence. If it's never in evidence, then I come back to my original question. What is the evidence upon which you rely to weigh against the trustee? It was not offered in evidence, but it's part of the record. It was listed on the pretrial statement. It was contained in the exhibit book that was given to the trial judge. And it was also discussed. It was never offered in evidence. No, it wasn't. Okay. And it was also discussed by both Judge Agresti and Judge Fischer. Did your client offer any proof during the proceedings at all as to where this money deposits that were not attributable to your client's wages came from? No, because we didn't think we had the burden of proof on that issue. We thought the trustee did. You understand that if one party has a burden of proof, the other party, nonetheless, can offer evidence to help establish that they haven't met that burden. And if they haven't offered any evidence, then something may outweigh nothing. Do you understand that? Yes, I do. Okay. I believe my time is up, but I do have three minutes for rebuttal. No, did he use his time for rebuttal or not? He did not. Yes, you certainly do. Thank you, Your Honor. Thank you. Good afternoon, Justices. My name is Neil Levin. I represent the trustee, Jeffrey Sikorica, as appellate counsel, if it pleases the Court. Counsel? Members, I regret that what we're presenting to you today is something other than some argument on jurisprudence or some novel theory of law. I regret that we're not discussing whether or not certain 80 years of history in the authority should be overturned. If there's some reason we should reject that authority. Unfortunately, what we have before you is a game of what's behind that curtain. Before we go too far behind the curtain, just looking at the schedules I and J that you all rely on a lot. Yes. As I understand it, we start out with $933,000 from the tax returns. That's correct. The courts subtract $405,000 for taxes. That's correct. And they get down to $525,000. Sometimes they say $535,000, but they mean $525,000. I think you saw the subtraction error too. That's correct. But anyhow, if you look, we've got $380,000 that you take out of that, which leaves about $140,000. Correct. Well, you know, his house payment alone is $4,000 a month, and that comes to $192,000. Help me with how we get around the simple facts that it doesn't leave enough for any necessary expenses. Everybody conceded, both the courts below, that the house payment was okay. Help me with that problem in the case. So I believe Judge Gersti made that analysis. In fact, he even comments specifically about the mortgage payments and saying that obviously we have to leave enough for that, and he did. And Judge Fischer went through that same analysis. $142,000 is less than $192,000, so help me with that problem. Right. You know, what we can do is we can look to actual fact that the transfers into the account were well more than $900,000. It's the wages, the subset of wages that we're talking about that went into that account, and that's what Judge Gersti used initially as his analysis. Let me back up just a sec so I can explain that in a bigger picture. We're getting caught up in this idea of it only being wages that we're talking about. Under the Pennsylvania law and under the fraudulent transfer statute and the uniform fraudulent transfer law that's accepted by most unions in the country, it's not just the wages that we're talking about that could be fraudulently transferred into this account. It's any money that belongs to the individual judgment debtor that might be transferred into the account that would be a fraudulent conveyance. Here, Judge Gersti gave deference to the fact that, yes, this was not presented by trustees' counsel at the time in the best way possible. He would have liked to have seen something more specific as far as the total transfers. So what he did is he took out a subset from what he can deduce from the evidence that he had before him, and that subset was just the wages because it's just that line item on the tax return that he drew from. It's just wages. The tax return offers up evidence of all sorts of different activity in the financial affairs of the taxpayer, but just the one line item on wages is what he drew from, and that was the $933,000. The grand irony of this discussion of Exhibit 23, as pointed out in our motion to strike Exhibit 23, is that if you look at the totals of just the deposits, not taking it from the tax return itself, but just the deposits of wages, it's actually $700,000. I thought Exhibit 23 is not in evidence, right? Right, and that's why I'm saying you can't use that as both a sword and a shield. No, I'm combining this with the response to your question, Your Honor, in that this exhibit, Believe that Exhibit 23, proceed. The amount of deposits that were made into the account was the uncertainty. The fact that he made these $900,000 in wages is what Judge Echristie used initially, and from that he, as you said, took the taxes of the deduction. With that, he then used a separate analysis in determining what are necessities, and quite frankly, I disagree that this was the way that initially it should have been presented by the trustee as well. I think that under the fraudulent transfer act, it's actually a very simple analysis. Money moves from one party to another. That's the transfer, and from there we deduct the necessities. Judge Markovitz, way back when, had suggested in both Titus and Arbogast that we have to look at it slightly different. The trustee's burden was not so much that simple addition and subtraction. The trustee's burden was showing that there were, in fact, non-necessities that were expended or purchased or however, that were part of the equation. These non-necessities were the things that the trustee did, in fact, present there, and it's those non-necessities that then became the basis for the offset. So I understand your question, and I see where we want to go very simply with the math, but unfortunately, Judge Markovitz set wheels in motion that made it less than simple. The case was such that the trustee first says, here's the amount of money that was transferred, and instead of just saying, let's deduct the things that were non-necessities, we have to then prove up each non-necessity individually, and then we take that as an aggregate and we deduct it from the whole. And in doing that, we don't get to the analysis of, well, let's add up the necessities, which is what you've asked. We don't get to the analysis of, let's add up the mortgage payments, let's add up the groceries. And so I don't think we have that irreconciliation that you're suggesting, Your Honor, because we don't get there. Unfortunately, we get to a place where I think, in the end, we don't get to the best dollar amount. I don't think we even get to some of the best analysis, and at times I agree that it's troublesome, as counsel has pointed out, to go through this analysis in this fashion. In fact, even Judge Agristi says he didn't like the analysis but was bound by it. He says it specifically, he says he doesn't like the dollar-for-dollar offset. Now, you say when he's bound by it that those are by other bankruptcy decisions? So as you know, these are all part of five different bankruptcy cases. Yes. And, Your Honor, there's been a tremendously troublesome history of that. Yes, but I'm asking a simpler question. Is there any third circuit law in the issue you're talking about? Judge, yes, the esteemed panel on this very bench in the Arbogast case supported the very theories that the trustee has presented. And that dollar-for-dollar offset was, in fact, affirmed. When Judge Markovitz ruled in Arbogast, that went up to the district court and then, of course, to the third circuit, he affirmed that dollar-for-dollar offset analysis. And that dollar-for-dollar offset analysis is very unique. And what he was saying was that there may be depositors into the account other than the judgment debtor. Both in the Arbogast case and the Titus case, which went to the district court and back and is now on remand for certain evidentiary hearings, there was a spouse who deposited money into the entirety's account. We don't have that here. There's an admission by both the party defendants that there were no deposits by Betty Reddick into the entirety's account. So we don't even get to that analysis that my opposing counsel would like us to get to. Counsel, I'm looking at your brief. You don't cite any third circuit law. I don't think. Arbogast case is third circuit, Your Honor. I see that you cite five cases, four bankruptcy cases in Western District, Pennsylvania. No, you say somewhere in there you cite a third circuit case. It's the first case listed on page I under Table of Authorities, and it's cited at page 16, I believe. That's the first instance of that case. That's a bankruptcy case. I'm sorry, that's the underlying case, which was that affirmed by this circuit. Okay, but you don't show the affirmed in your brief, I don't think. I apologize for that, Your Honor. I said there was no third circuit law after reading your brief. It shows a bankruptcy thing. I see that now, Your Honor. I see that just the bankruptcy citation in the string is given and not the affirmation. But you said that was affirmed. It was affirmed here, Your Honor, yes. Okay, good. And it was affirmed in the respect that's relevant to this case. Yes, Your Honor. Even the parts the trustee doesn't like. Even in your text, you don't cite the third circuit. You still cite the bankruptcy court on page 16 where you discuss the Arbogast case. No, I'm terribly sorry for that oversight. That was obviously erroneous on our part. But, yes, I can assure you that that case has been affirmed before the third circuit. Okay. And the parts that were affirmed include the analysis that we're discussing today relative to the burden of proof, burden of persuasion, and the one that we're not arguing today, and that was this dollar-for-dollar offset. I'm just stunned, I have to say, Your Honor. I'm extremely stunned that the strings do not include that and that we missed that. But I think that if I may offer any legitimate excuse whatsoever, it's that it was assumed that all these cases were tied together and they are cited routinely as having been brought to the third circuit by opposing counsel in his briefs. Nonetheless, Your Honor, I believe we can bring the various arguments of Mr. Wettick down into five short statements, despite there being listed as ten different issues on appeal in the briefs. One, that the two lower courts erred in calculating how much money was deposited into the PNC and Tyrie's account, this despite there being an answer that affirmed that money was, in fact, deposited into the PNC and Tyrie's account, and that there was trial testimony given by both the defendants to that effect. Second, that two lower courts erred in concluding that these deposited funds paid for necessities. We have the Titus analysis constantly coming to light here by opposing counsel in their briefs. However, the Titus analysis doesn't apply because we don't have a second-party depositor into the entire Tyrie's account. Third, two lower courts erred in determining what actually were necessities, and counsel himself waived a discussion of that argument. I won't spend much time there, but simply some of my favorite quotes are that we needed an extra garage because we have seven cars for two people instead of a car or two cars for seven people. But what's more is this is work that's actually quite stunning in the briefs in that all sorts of evidence is being presented in the document here before the Third Circuit for the very first time that clearly is not part of the record. And we go into great detail and show which statements made in their briefs are nowhere in the evidentiary record. Fourth, that the trustee should have offered Exhibit 23 and claims that the trustee somehow breached a duty to the court by not offering Exhibit 23. Now, we could speculate for several hours perhaps on why the trustee didn't offer Exhibit 23. Judge Agristi made a little speculation in his memorandum of opinion as to why Exhibit 23 was not offered. I put before the court it wouldn't matter. It simply wouldn't matter. It wouldn't change anything except perhaps for the better for the trustee. But the fact of the matter is it was not presented to the court and there's certainly no authority that the trustee breached his duty by not offering something that was in a pretrial statement into evidence that he did not use during the trial itself. And their last complaint is that despite the fact that many courts, including this Third Circuit in the Arvogast case, have affirmed 80 years of the application of case law in the state courts, as well as the Minin case, which is a bankruptcy court opinion, relied on by all the justices in these related cases, that these types of transfers are in fact fraudulent transfers subject to the offsets that the court is aware of, counsel still comes in and says that they're not fraudulent transfers. And I think that as Judge Fischer noted in the memorandum of opinion, I just don't see why we need to spend much time on this because it's pretty well accepted and I'm not certain how we can go about it. Is that because of it being the direct deposit issue? Is that why they're saying it's not? You know, I wouldn't go to speculate as to why it is that they're making this argument the way they are. I think that there is discussion in their brief about this direct deposit issue. That was resolved by virtue of Mr. Weddick's testimony saying, of course I directed that the deposits go into the account. So I think Judge Agristi clearly accepted that was a control of the funds and directing the funds into the account made it such that there were not wages. There's lengthy discussion about the fact that under the Commonwealth here in Pennsylvania, they do not allow for garnishment of wages while in the hands of the employer. That argument has been rejected as being a basis for why these transfers would not be fraudulent transfers and so accepted by the mining court and accepted by this circuit and the Arbogast case and by Judge Markovits and by Judge Agristi and by Judge Diller and by Judge Fischer and others. Why are the tax returns sufficient in this case that they weren't relied on in any prior case out of the same litigation? Yes, they were, Your Honor. The district court says the bankruptcy court relied entirely on Weddick's income tax returns to demonstrate his earnings. Well, in these other cases, none of them relied solely on the income tax returns. I believe the Orbodick case may have relied in part on the tax returns as well. Well, in part, but not entirely. Probably not entirely, yes. I think that might be right. So why should we rely entirely on them here? Because it's not the only evidence that was presented. Judge Agristi allowed for the totality of the evidence being not only the tax returns but also the testimony of the judgment debtor, in this case the bankruptcy debtor and his wife, as well as their answer to the adversary complaint. So we have admissions that this money went into the entirety's account. Far more than just saying, well, because it's on the tax return, therefore, it must have gone into the account. I think that was one of the three elements that Judge Agristi and Judge Fischer relied on in making no conclusions. To the point of 400,000 more beyond wages went into this entirety's account, how do we know that that wasn't used for the non-necessities? It may have been, which would make our case even better. Why would it make it better? Because we'd be starting at a higher bar against which we would offset the non-necessities. There would be more money transferred by the debtor into the entirety's account. Reminding the Court that it is the act of moving money from the hands of the judgment debtor into the hands of the wife. That constitutes the fraudulent transfer. And Pennsylvania is extremely unique. They're one of the few states in the Union that allows entireties for checking accounts. So it makes it a little bit of a more unique analysis in this jurisdiction than any other relative to fraudulent transfers, which is why there is the comment section in the statute which helps and offers some guidance in terms of offsets. The theory then being that because it's going to the wife, and that is a fraudulent transfer, but it's also a joint account. And from that joint account, you may be making expenditures for necessary expenses, and we need to offset that. That's why that's a unique analysis to Pennsylvania's common law. With that said, Your Honor, it's that movement of the money into the entirety's account that is the fraudulent transfer.  by the judgment debtor, we'd have a bigger judgment because we'd be starting the bar higher against which we would offset the non-necessities. Let me ask you this. I found your Third Circuit case. It does exist. However, it's not published, so it's not binding on this panel. Is that correct? I can't speak to that, Your Honor. I understand that from the Third Circuit rule. I do know that the judges below have relied on it rather extensively. Certainly, yes. There was a written opinion. You're quite correct that it was unpublished. And they do tend to do that even when they're unpublished. The lower court judges are a little bit loath to say, we're not going to follow that if it's not even published. Well, again, Your Honor, the history of the case is such that there have been many, many judicial hands touching these cases. By unfortunate circumstances with the death of Judge McCullough and so on and so forth and the retirement of Judge Markovitz. So a lot of judges have been involved in even just one sole aspect of the case, this particular adversary case. In counseling getting the $405,000, the lower courts used the Schedule I amount of the taxes. Yes, sir. Did the debtor adopt that in the stand, the I and J? Adopted on the stand? Yes. I believe there was testimonies to the Schedules on the stand. So you think that he did say they were accurate or good averages or some such words? Well, I'm sure Your Honor knows that upon submitting the Schedules and signing them under penalty, partially they are deemed accurate. That would be a felony offense if for some reason they were not accurate. In fact, there is testimony that's before the court in the record relative to the automobiles where the judgment debtor himself says, well, I didn't really give those values. Well, an average value, but we can quibble. Any other questions for the panel? No, I don't think so. Thank you for your time. Thank you very much for your time. He's got three minutes. Thank you. I would like to address Judge Gilman's last question first as to why were the tax returns sufficient, which we believe they were not. There is a very similar case. One of the related cases is called Shearer v. Overdick. It's cited in our brief at page 15. In that case, Judge Agreste wrote the opinion just as he did here, and he said the trustee did not offer direct evidence of the amount of deposits, and he was faced with three choices. He could throw the case out. He had found a couple of direct deposit statements that he could have averaged out over the four-year look-back period, or he had all of the tax returns which he could have relied upon, and he said he wouldn't rely upon the tax returns because they were not sufficient. So I don't think it's sufficient here. And it's also inconsistent. As a practitioner defending these kinds of cases, how are we to know what to do? Well, counsel, now on your Schedule I, you say that there's about $1.2 million of income over this period of time. And, of course, that's $900,000. That's what the lower courts are trying to say when they say that, you know, if anything, by doing the 933, we're going low on his income. Right. But the $1.2 million would account for all four years, and all four years did not fall within the look-back period because of this. But there had to be a 48-month period there, counsel. There has to be a four-year period. There was a 48-month period. There's no question about that. And you're the people who put the average on Schedule I of $25,000 a month, which comes up to the $1.2 million. Okay. So it's got to be in that range, doesn't it? It probably is in that range. But what I'm saying is Judge Agresti, in another case, said tax returns are not sufficient evidence, and in this case he said they were. Let me ask you this way. Can you gripe if you said it was $1.2 million and they say it's $933,000, where's your gripe? It looks like they gave you a break, and I think that's what the two other courts are saying. I wouldn't disagree with that if the tax returns are valid. As to your point, Judge Benton, that's why we did not cite the Arbogast Third Circuit opinion, because it was unpublished and a memorandum of opinion. Thank you. To say that there were no deposits by Betty Wittig, that's true, but there were deposits from the Wittig's joint investment account, Merrill Lynch, and they add up to a very significant number. They're all on Exhibit 23, and if the court decides to admit that into evidence, we're entitled to offsets based upon the case law. Thank you. Thank you for your arguments here today. Appreciate the briefing in the case. Appreciate the argument in the case. This case, Wittig case, is submitted, and the court will be in recess.